[Crim. No. 30246. Second Dist., Div. Two. May 17, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK KIKO SOLTERO, Defendant and Appellant.

**COUNSEL**

Paul Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Kent L. Richland and Edward H. Schulman, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FLEMING, Acting P. J.**—Defendant Frank Kiko Soltero appeals his conviction by a jury of first degree murder of Patricia Delgado (Pen. Code, § 187). An instruction on murder by torture was given.

At 9 a.m. on 4 July 1975 a neighbor discovered Patricia Delgado's body in her own apartment. The coroner's autopsy revealed three stab wounds on her thumb; a superficial stab wound to her open left eye and under her left breast; three blows to the left side of her head resulting in cerebral hemorrhage; two nonfatal strangulations (by hand and with an abrasive ligature) of two to three minutes duration; thirteen stab or slash wounds to the neck and throat, which if unattended would have produced a fatal loss of blood; and a fatal fourteenth deep stab wound to the throat. The wounds and blows were inflicted over a four- to six-hour period, and the coroner estimated the time of death as within four or five hours, plus or minus, of midnight on the evening of July 3-4. Police investigators discovered defendant's thumb print on the telephone in the victim's apartment.

The testimony of witnesses developed the following train of events prior to the murder: About 1:30 a.m. on July 3 residents of the Fred Rodriguez household (Terry and Rosie Rodriguez, Fred's daughters) were awakened by a knock at the front door and a voice asking if Cricket were there. Daughter Terry opened the door a fraction, saw defendant and another man, neither of whom she knew, and heard defendant again ask if Cricket were there. (Edward Rodriguez, alias Cricket, was the brother of Fred Rodriguez.) When she answered in the negative, the other man threatened to beat her if she lied and then kicked the door open. Defendant instructed his armed companion to search the other rooms for Cricket. Terry's brother was awakened during this search and when daughter Rosie told him to get their father, defendant said, "Call him if you want to see him go down." Rosie stayed in the living room, but Terry went into the back room to wake her father and step mother, who called the police.

Defendant ordered his companion to bring in Pat Delgado, Cricket's girl friend. Brought in by her hair she was crying and had a slight cut on her mouth. Defendant repeatedly jabbed her with his elbow. When Pat

asked Rosie where Cricket was, Rosie said she didn't know, but he might be at "Aunt Carmen's" (Carmen Juarez, sister of Cricket and Fred Rodriguez). Defendant told Pat she better find out where Cricket was, or she or one of her children were going to die. After Fred also said he didn't know where Cricket was, defendant and his companion left the premises with Pat.

At 1:40 a.m. defendant's vehicle was stopped and detained by police officers responding to the "unwanted guest" call from the Rodriguez residence. There were four people in the vehicle—defendant, Pat Delgado, and two other men. The occupants were detained about 20 minutes, while a warrant check was made and the complaining party contacted. They were then released.

About 3 a.m. Yolanda Rodriguez, who was staying in South Gate with Carmen Juarez (Cricket's sister), was awakened by knocking and a voice asking for Eddie. When she asked who it was, a voice replied, "Open the door, you bitch, before I kick your ass." Gilbert Juarez, Carmen's husband, unlocked the door, and defendant pushed it open. Defendant ordered the man with him to search the house, which he did, kicking sleeping children and punching the grandmother who lived there. Carmen and Gilbert disavowed knowing any person named Eddie or Cricket, and when they asked defendant why he wanted him, defendant said, "He burned me. Nobody burns Kiko." Defendant threatened to "get them" if they were lying, and told his companion to "get the bitch from the car." Held by her arm and hair Pat identified Carmen as Eddie's sister, but Carmen said she didn't know Pat. Pat pleaded for help, and defendant told her "If I don't get Eddie, you're dead bitch. I'll kill you right here in front of this woman. You're dead, bitch, you're going to die tonight." As they left, with Pat crying and screaming for help, defendant threatened to come back and "get" Gilbert Juarez.

On the morning of July 3 a person who sounded like defendant telephoned Rosie Rodriguez and said he wanted to meet her somewhere. When she refused, the caller told her she better forget what he looked like. Several other calls were made to the Rodriguez household that morning, some by defendant, all asking for Cricket.

About noon Carmen Juarez received a telephone call from Pat, who asked for Eddie. Carmen testified that Pat sounded as though she were loaded and scared and did not make sense when she talked.

At 2 a.m. on July 4, Maria Zamora, defendant's mother, received a telephone call from defendant, who told her he was in a lot of trouble because a friend had just killed a girl, and not to say anything if the police came.

Defendant was arrested in El Paso, Texas on September 18.

After presentation of this evidence at trial, the jury was instructed on willful premeditated murder, murder by torture, and accessory to crime. The jury returned a guilty verdict of first degree murder.

Defendant assigns as error the trial court's refusal to allow defense counsel on voir dire to ask each juror: "If the judge instructs you that you cannot convict on circumstantial evidence unless the evidence excludes every reasonable conclusion except the guilt of defendant, will you follow that instruction?" Defendant asserts the question was within the proper and permissible scope of voir dire and the trial court's refusal constituted prejudicial error due to the circumstantial nature of the prosecution's evidence.

■ Counsel's right to voir dire under Penal Code section 1078 is limited to a reasonable examination of prospective jurors which does not seek to provide a basis for exercising peremptory challenges, educate the jury panel as to particular facts, compel jurors to vote a particular way, prejudice the jurors for or against a party, argue the case, indoctrinate the jury, or instruct the jury in matters of law. (*People* v. *Crowe* (1973) 8 Cal.3d 815, 824, 828 [106 Cal.Rptr. 369, 506 P.2d 193], citing *Rousseau* v. *West Coast House Movers* (1967) 256 Cal.App.2d 878, 882 [64 Cal.Rptr. 655].)

■ Defendant acknowledges these limitations but contends that, subsequent to the trial court's general discourse and interrogation of the jury panel as a whole on its duty to follow legal instructions, trial counsel had an absolute right to specifically inquire about an individual juror's willingness to apply a particular rule of law. We disagree.

The Supreme Court in *Crowe* emphasized not only a "reasonable" right of counsel to examine jurors under Penal Code section 1078, but, more importantly, a concomitant duty of the trial court to insure selection of an impartial jury. (*People* v. *Crowe, supra,* 8 Cal.3d at p. 828.) Defendant claims that a general inquiry into a jury panel's willingness to follow legal instructions is inadequate. The claim has no merit. Collective

voir dire of the jury panel by the court, without individual inquiry on each question, is permissible under *Crowe* and under Penal Code section 1078. (*People* v. *Dorsey* (1974) 43 Cal.App.3d 953, 965-966 [118 Cal.Rptr. 362], summarizing cases.) At bench, the trial court not only painstakingly explained to the jury panel its duty to follow the law, but also allowed trial counsel wide latitude in examination of prospective jurors. Its refusal to allow defendant's specific question did not constitute error. (Cf. *People* v. *Orchard* (1971) 17 Cal.App.3d 568, 576 [95 Cal.Rptr. 66].)

Defendant next contends the trial court improperly instructed the jury on murder by torture (CALJIC No. 8.24) and aiding and abetting (CALJIC No. 3.01), in that evidence of the requisite intent on the part of defendant or his companions was lacking.

■ To support an instruction for murder by torture under Penal Code section 189, there must be evidence that the murder was committed with a willful, deliberate, and premeditated intent, not necessarily to kill the victim, but to inflict extreme pain. (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665].) It is a crime where: ". . . the killer is not satisfied with killing alone. He wishes to punish, execute vengeance on, or extort something from his victim, and in the course, or as a result of inflicting pain and suffering, the victim dies. That intent may be manifested by the nature of the acts and circumstances surrounding the homicide." (*People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51]; cited with approval in *People* v. *Wiley* (1976) 18 Cal.3d 162, 172 [133 Cal.Rptr. 135, 554 P.2d 881].) Defendant correctly asserts the mutilated condition of the victim's body is insufficient by itself to demonstrate the requisite intent. (*People* v. *Anderson* (1965) 63 Cal.2d 351, 359 [46 Cal.Rptr. 763, 406 P.2d 43].) However, the condition of the body is a circumstance to be considered in conjunction with other circumstances in determining the sufficiency of evidence to support an instruction on murder by torture. (*People* v. *Wiley, supra,* 18 Cal.3d at p. 168; *People* v. *Beyea* (1974) 38 Cal.App.3d 176, 201 [113 Cal.Rptr. 254].)

■ Defendant was extremely agitated because "Cricket burned me." He forcibly searched two residences to find him, physically abused the victim when asking her about Cricket, threatened to "get" the residents or kill the victim if they were lying, and said to the victim "If I don't get Eddie, you're dead, bitch, you're going to die tonight. I'll kill you right in

front of this woman," whereupon the victim was lead away screaming. These actions and threats evidence defendant's actual malice, and, when considered in the light of the condition of the victim's body and the coroner's testimony that the wounds were inflicted over a period of four to six hours, they furnish adequate evidence to support a jury instruction on intent to punish or extract vengeance from the victim by infliction of severe pain.

■ Defendant's assertion that there was no evidence of malice on the part of his companions misses the mark. Aiding and abetting instructions were given, not for the purpose of implying the necessary intent of his cohorts, but rather to instruct the jury that defendant could be held liable for the crime even if he merely instigated or advised the crime with the requisite intent. (Pen. Code, § 31; *People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198]; citing *People* v. *Villa* (1957) 156 Cal.App.2d 128, 133-134 [318 P.2d 828].) The jury could reasonably infer defendant's intent to inflict extreme pain from the facts and circumstances of the case. The actual or implied state of mind of his companions, or of the actual perpetrator (whether or not the defendant), is irrelevant.

■ Defendant further asserts the trial court erred in failing to instruct the jury *sua sponte* that intent to inflict extreme pain, which is required to establish murder by torture, cannot be inferred solely from the condition of the victim's body. The trial court is under a duty to instruct the jury, even in the absence of a request by the parties, on general principles of law which are ". . . closely and openly" connected with the facts before the court and which are necessary for the jury's understanding. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) To this end, the trial court properly instructed the jury on murder by torture by giving CALJIC No. 8.24, which correctly states the elements of the crime. (*People* v. *Wiley, supra,* 18 Cal.3d at p. 173.) It does not follow that because the requisite intent cannot be inferred solely from the condition of the body, the trial court was under a duty to instruct the jury to that effect. Absent an appropriate request by a party, a trial court is under no duty to give an instruction which limits the purpose for which evidence may be considered. (*People* v. *Nudd* (1974) 12 Cal.3d 204, 209 [115 Cal.Rptr. 372, 524 P.2d 844]; Evid. Code, § 355.) In making the threshold determination that there was sufficient evidence of intent, in addition to that of the condition of the body, to justify the murder-by-torture

instruction, the trial court fulfilled its responsibility. While the court might have given a limiting instruction on the issue of intent, absent a request by trial counsel it was not required to do so.

The judgment is affirmed.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied June 13, 1978, and appellant's petition for a hearing by the Supreme Court was denied July 13, 1978.